Catherine **MEHAFFEY, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. A14–81–370–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 12, 1982.

Will Gray, Houston, for appellant.

Ray Elvin Speece, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and PRICE, JJ.

OPINION

PRICE, Justice.

This is an appeal from a conviction for attempted murder. Trial was to a jury who found the appellant guilty and assessed her punishment at ten years incarceration. Appellant does not contest the sufficiency of the evidence. Appellant asserts two grounds of error relating to the admissibility of evidence on the reputation of the complainant for truth and veracity, and the admissibility of the conclusion or opinion of a police officer on conflicting statements of appellant made while under arrest. We sustain both grounds of error urged by appellant and accordingly reverse and remand.

In ground of error number one appellant asserts that the trial court erred

in permitting the State to present testimony that the complainant's reputation for truth and veracity was good when he had not been impeached and neither his character nor his reputation for truth and veracity had been placed in issue by appellant. In the instant case both the State and appellant agree that the crucial issue is the interpretation of the evidence, namely whether the complainant was impeached by appellant on the basis of a prior inconsistent statement, since they do not dispute or argue the rule for admitting such testimony. The general rule for admitting evidence of one's reputation for truth and veracity is that such is inadmissible when the evidence that antedates it is merely contradictory. *Stewart v. State*, 587 S.W.2d 148 (Tex.Cr. App.1979) The rule is clearly stated in *Wallace v. State*, 501 S.W.2d 883 (Tex.Cr.App. 1973):

> In *Matthews v. State*, 80 Tex.Cr.R. 177, 189 S.W. 491, this Court, in sustaining the trial court's refusal to permit defendant to prove by two witnesses his good reputation for truth and veracity, said: "The rule is well established that, if the State had attacked his general reputation for truth and veracity by any witness, or had attempted to impeach him by proving contradictory statements, then he would have been permitted to have introduced such proof; but, until such contingency arises, the fact that he gives testimony disputing that offered by the State would make no such testimony admissible." [Citations omitted]

However, where a witness has been impeached by a prior inconsistent statement or his character trait or reputation has been placed in issue, evidence as to his reputation in a community for truth and veracity is admissible. *Stewart v. State, supra* at 154.

■ In the instant case the State offered the testimony of seven witnesses that the complainant's reputation for truth and veracity was good. Appellant timely objected to this testimony on the basis that no evidence was before the court except contradictory evidence and therefore, it was impermissible to bolster the testimony of the witness by proof of his good reputation for truth and veracity. At trial the State contended the good reputation evidence was admissible because the complainant's credibility and character had been attacked: "... The State's position is the defendant herself by her own testimony called the defendant a liar, a fool, and that he was crazy." On appeal, the State concedes that nothing in the record reflects that Ms. Mehaffey did in fact call the complainant a liar. Ms. Mehaffey did testify that some members of the news media said that complainant was a "fool" because he played in the press room secret recorded conversations with Ms. Mehaffey. The record also reflects that Ms. Mehaffey did depict the appellant as "crazy." The circumstances of such depictions are discussed later in the opinion.

On appeal, however, the State relies principally on the theory that evidence of the good reputation of a witness for truth and veracity is admissible where the witness has been impeached by a prior inconsistent statement. The State points to three areas to demonstrate the alleged impeachment of the complainant by prior inconsistent statements, none of which is valid in our opinion. The first of these involves a diagram drawn by the complainant to show his path of escape from his assailant. Appellant had testified that the complainant had a .22 pistol with which he threatened to kill her before she shot him. The State contends that appellant *implied* in her cross-examination of the complainant regarding the diagram that the complainant was currently fabricating his testimony with reference to his path of flight from appellant's house after he had been shot so as to remove any possibility of his having been near the location where a .22 pistol was recovered in a gutter. The State contends that appellant *inferred* that the complainant had testified differently on the point in a previous trial merely by the nature of the appellant's questions about his previous testimony. The testimony the State relies on to show impeachment of complainant through a prior inconsistent statement is as follows:

> MR. SKELTON: One item I noticed from the trial

Q: Last time, you drew a diagram, correct, of where you ran? Is that true?

MR. TAYLOR:

A: Yes.

Q: I believe your testimony was at the previous hearing that you ran down the side of the street, is that correct?

A: I believe my testimony was that I don't recall whether I ran down the side or down the street. I think at one point I was running down the side and at one point the street.

Q: As a matter of fact, you also know— do you know there were several guns in your area? Is that correct?

A: Only I heard that.

Q: You know that from the previous hearing?

A: I heard it. I wasn't there.

Q: Did you notice certain guns were recovered from the gutter?

A: Yes.

Q: Did you also know with the certain guns recovered from the gutter they found some items of red thread? Is that correct?

A: I have been told that.

Q: Red thread like red on your pants? Isn't that correct?

A: I have no idea.

Q: They are red pants?

A: Yes.

Q: And, *you conveniently drew your pathway away from one of the guns recovered that contained some red particles?*

A: I don't think I conveniently drew my pathway away from anything up there.

Q: At least from your drawing, they are well away from the gutter, isn't that correct?

A: The drawing is not too far away from the gutter.

.    .    .    .    .

Q: I noticed when you drew your flight, it was well away from the gutter.

A: I had no concentration at all on the gutter when I was drawing the flight.

Q: You know from a previous hearing there was a .22 pistol recovered in that gutter?

A: I don't know.

Q: One thing we can agree on, when you drew your line showing where you ran, it's not near the gutter? Correct? We can agree on that?

A: It's closer to the gutter than some other things.

Q: But, it pretty well away from the gutter written on diagram? Isn't that correct?

A: That's where I ran, somewhere in that vicinity, down the street or sidewalk ... somewhere around there.

The State did not present evidence to prove what the complainant's testimony had been at the previous trial. Nor did they introduce evidence to prove his testimony was different or inconsistent in any manner with the above quoted testimony. An "implication of a contention" or an "inference" does not constitute the making of a prior inconsistent statement. The mere asking of the question, particularly the one emphasized by the State as quoted above, does not establish that a prior inconsistent statement was in fact made by the complainant. We do not believe the above quoted testimony and emphasized question shows impeachment by a prior inconsistent statement.

Secondly, the State contends that appellant's counsel again impeached the complainant with testimony given on a prior occasion concerning whether he heard another shot as he lay on the ground in front of appellant's house:

MR. SKELTON:

Q: Mr. Taylor, did I understand your testimony yesterday when you told this jury about the flight from the house when you fell on the ground that you stayed, that you laid on the ground for a few moments and heard another shot? Is that what you said yesterday?

MR. TAYLOR:

A: Yes.

Q: And you distinctly remember hearing one other shot outside the house when when you layed on the ground, is that correct?

A: I believe I heard another shot.

Q: My question is, I think when you told the jury yesterday you said you distinctly heard the shot. Now you are saying you think you heard?

A: I heard that all night long after that.

Q: When you were lying on the ground outside the house—I will repeat the question. You told the jury yesterday you heard another shot. Did you hear a shot or did you think you heard a shot?

A: I think I told them I thought I heard another shot.

Q: Your testimony is today you think you heard another shot, is that correct?

A: True.

Q: You cannot be positive of that, can you?

A: I don't know how positive I can be. I heard something that directed my attention and made me realize Catherine was coming out of the house. I believe it was a shot.

Q: Do you recall testifying back at the previous hearing of this case?

A: Yes.

Q: Do you recall this testimony? Let me direct you to line twenty-four through twenty-five and on the following page.

. . . . .

A: Yes, I have read it.

Q: And what did you say back in that previous hearing with reference to the shots?

A: For some reason, I became aware she had come out of the house after me. I can't remember now whether I heard another shot. For some reason I learned she was coming out of the house. I took off again running down the street.

Q: That's substantially the same thing as your testimony is today, correct?

A: And yesterday.

Q: Yesterday, if I recall correctly, you said you distinctly heard another shot or I heard another shot?

A: You may be mistaken. If I said distinctly, definitely, positively, with no ifs, ands, or buts that I heard another shot, then I should have said, I thought I heard a shot. That's what I meant to say. I believe that's what I said.

The testimony of complainant on the previous day of the second trial was that he had fallen on the sidewalk in front of appellant's house after being shot. He then testified as follows:

MR. GRAHAM:

Q: Okay. Did you stay in that position on the ground for a few moments?

MR. TAYLOR: Yes.

Q: And then what did you do?

A: Well, I heard another shot, and I realized that she was in fact going to pursue me out of the house. So I decided I better get up and run some more, which I did.

We do not believe that the foregoing constitutes an impeachment of complainant based on a material prior inconsistent statement that would permit the introduction of good reputation of the complainant for truth and veracity.

The third area which the State contends demonstrates the impeachment of the complainant by a prior inconsistent statement made in a prior trial dealt with the appellant's alleged threat to kill the complainant if he continued to list appellant as a burglary suspect. Again, the State claims that appellant's counsel implied in his cross-examination that the complainant had fabricated his current testimony. The State relies on the following testimony to establish the prior inconsistent statement and the implied charge of fabrication:

MR. SKELTON:

Q: You said at some point when you were at Jim Strong's house or Catherine Mehaffey's house, you said she said if I screwed her up on this, if I continued to list her as a suspect, she would kill me, is that correct?

MR. TAYLOR:

A: Yes.

Q: You are telling this jury you were told by Catherine she would kill you if you listed her as a suspect?

A: That this was one time she told me she would kill me.

Q: I am talking about that occasion?

A: She said, Gary if you * * * * me up, if I give you your property back and you go and tell the police, I will kill you.

Q: She said that in regard to the burglary?

A: Yes. I can tell you the exact words that came before these words.

Q: I would like to show you again some previous testimony, page one twenty-one in the transcript, lines four through ten. If you will review those, please sir.

A: Yes.

Q: That was testimony you gave at a previous hearing, correct?

A: Yes, true.

Q: Testimony you gave under oath, is that correct?

A: Yes.

Q: What did say then was the conversation with Catherine Mehaffey about the burglary?

A: You want me to read the whole conversation?

Q: Those lines I asked you to read.

A: That's just one small portion of the conversation.

Q: Read if you would what I have shown you.

A: "Question. What did she tell you what she wanted in return for your property? Answer. It was the same set of demands, that I go and tell Don Stricklin I am crazy; that we lay off the burglary complaint. We had listed her as the chief suspect with the police. She wanted us to back off of that. She wanted all of tape recordings."

Q: And go ahead and read the next question and answer?

A: "Question. Anything else? Answer. That's all I can remember."

Q: Back in the previous hearing, you did not testify that she was going to kill you for threatening to list her as the suspect in the burglary case?

A: Not for threatening to list her as a suspect.

Q: Yet, you told this jury yesterday Catherine told you if you continued to list her as a suspect she would kill you?

A: I don't believe I said if I continued to list her as a suspect. I believe I said was exactly what I told you a few minutes ago, if I continued to follow through on the burglary complaint, which I would have done had she given me the property back.

Q: So, your testimony today is what, please, sir? That she threatened to kill you if she was listed as a suspect or she did not threaten to kill you if she was?

A: She threatened to kill me if I were to go back and tell police she had given me the property back.

Q: So I am mistaken on what you said yesterday or you are mistaken?

A: I think we are both agreeing.

Q: Now we are agreeing . . .

In our opinion, the complainant was not impeached by the above quoted cross-examination. The questions and answers from the former trial and the present trial relate to two different matters. In the present trial, complainant was asked if he was told by appellant that she would kill him if he continued to list her as a suspect in a burglary to which the witness gave an affirmative response. The prior trial testimony relied on by the State as constituting impeachment was the question, "What did she tell you that she wanted in return for your property?" The responsive reply to that question was that she wanted him to withdraw the burglary complaint in which she was listed as chief suspect and that she wanted complainant to return all the secret tape recordings. It is not shown that in the prior trial complainant was ever asked if appellant threatened to kill him if he continued to carry through the burglary complaint listing her as a suspect. We do not believe the testimony shows that complainant made a prior inconsistent statement. The appellant's threat to kill the complainant was based on the continued prosecution of the burglary complaints listing her as a

suspect even after his property was returned to him, whereas the first trial testimony only related to what she wanted in return for the property. The prior trial testimony does not contain any reference or question about threats or what would happen if the complainant continued prosecution of the burglary complaint even after his property was returned to him. We do not believe that any of the above three mentioned areas relied on by the State establish that the complainant was impeached by making a prior inconsistent statement, nor do we believe that such testimony authorized or made admissible evidence of good reputation for truth and veracity of the complainant. *Wallace v. State,* 501 S.W.2d 883, 886 (Tex.Cr.App.1973).

Further, we do not believe the depictions of complainant as a "fool" or "crazy" constitute an attack on complainant's character trait for veracity. It was not appellant who called complainant a "fool", but rather members of the press who told appellant that complainant was a "fool" for his undisputed playing in the press room of secretly taped recordings between appellant and complainant taped while they were dating. The characterization of complainant as a "fool" by fellow press members does not under such circumstances relate to his credibility. Likewise, the depiction by appellant of complainant as "crazy" did not go to the complainant's character trait for veracity. The portion pointed to by the State in this regard was the response to the question asked appellant. "Why were you going outside the house after this shooting?" Appellant responded: "I thought maybe he had been shot and he might fall down somewhere in the street and die and I know he was *crazy* and repentant for everything he did probably, and he was stoned. If he died, I didn't want it on my conscience. I was going to throw him down on the ground and call the ambulance or something." We hold that none of the testimony pointed to and relied on by the State establishes that the character or reputation of complainant for truth and veracity had been attacked. Nor does any of the testimony establish that he was impeached by a prior inconsistent statement. The evidence of the complainant's good reputation for truth and veracity admitted at the instance of the State over objection by the appellant was not admissible. The credibility and weight to be given the testimony of appellant and complainant by the jury was of critical importance since they each gave differing accounts of the shooting incident. They also disagreed as to who was the aggressor. The complainant's testimony should not have been bolstered by evidence of good reputation for truth and veracity brought by responsible people in the community when there was no proper predicate of impeachment laid to render such evidence admissible. Appellant's first ground of error is sustained.

In her second ground of error appellant contends that the trial court committed reversible error in admitting the conclusory statement of Officer Cantu that, while appellant was under arrest and seated in a patrol car, she gave him two conflicting versions of the shooting. At trial, the State offered such testimony to "impeach the defendant's testimony of how she said it occurred in front of the jury." The trial court ruled that it would allow the State to ask Officer Cantu if the appellant made an inconsistent statement while she was under arrest in his patrol car, but that he would not allow the State to go into the explicit contents of the statement or conversation. The content of appellant's alleged contradictory stories were not offered or shown in the record either in the presence of or outside the presence of the jury, and we are unable to say whether they were contradictory. In the presence of the jury, Officer Cantu testified that he concluded the second story the appellant told him in the police car was different from the story she had told them earlier that evening.

Q: Did she tell you a different story when she came back to the car than she told you before she went to the bathroom?

Defense counsel: Object to this. It is directly contrary to the Court's ruling, and I move for a mistrial based on the

reasons we gave to the Court outside the presence of the jury.

The Court: Sustain the objection.

State: But, it's my understanding she objected, and there has not been an answer yet allowed. That's why I am trying to get an answer whether it was a different story.

The Court: He answered it once I will will let him answer it one more time, Mr. Graham.

Defense Counsel: Is the Court denying our motion for mistrial?

The Court: Yes, sir.

Defense Counsel: Note our exception.

Q: Was the story the second time different than the story the first time?

A: Yes, it was.

Therefore, the court did not permit development of the facts in the instant case, but only the bald conclusion of the officer that the appellant had in fact told him two different stories.

The State asserts that the content of the impeaching statements made by the appellant was admissible under the holding of *Girndt v. State,* 623 S.W.2d 930 (Tex.Cr. App.1981) and Tex.Code Crim.Pro.Ann. art. 38.22 § 5 (Vernon 1979). Appellant contends that admission of the statements into evidence was barred under *Butler v. State,* 493 S.W.2d 190 (Tex.Cr.App.1973) and *Rumbaugh v. State,* 589 S.W.2d 414 (Tex.Cr. App.1979) on the grounds that although they were not confessions in the strict sense, they were used to inculpate Mehaffey. Appellant further contends the error and prejudice to her was enhanced by the trial court's allowing the police officer to opine that the two inadmissible statements were conflicting. Further, appellant contends no predicate was laid that the statement to Cantu was in conflict with Mehaffey's testimony before the jury, but rather was offered as original evidence.

■ We conclude the evidence was admitted erroneously. *Girndt v. State, supra,* and Tex.Code Crim.Pro.Ann. art. 38.22 § 5 (Vernon 1979), permit the use of prior inconsistent statements of the accused as impeachment even while made under arrest. In *Girndt,* the predicate was first laid for impeachment before the impeaching statement to the police officer was offered. In our case, no predicate for impeachment was laid. Rather, it was offered as original evidence by the State. Because the State offered the testimony as original evidence, we do not believe that *Girndt* provides dispositive authority as the State contends. In any event, however, the statute does not make admissible the opinion or conclusion of Officer Cantu that "appellant told two different stories." If ever admissible under the proper circumstances, it is the statement of the accused that bears on his or her credibility which is admissible, and not the opinion or conclusory statement of the police officer. Further, there is no showing in the record that such stories, whatever they may have been, given to Officer Cantu were different than what appellant told the jury, although the State represented at trial and on appeal that was the purpose of the impeaching evidence. The inadmissible conclusory statement by Officer Cantu cannot be said to be harmless as cumulative with the testimony given by Officer Zohn as contended by the State, because it is further not shown that the testimony of Officer Zohn on the matter was similar or the same as that evidence offered by Officer Cantu. No connection is shown in the record that they are the same or similar in content, and in fact no connection at all is shown between the two pieces of evidence. We are unable to say the error was harmless. Appellant's second ground of error is sustained.

The judgment is reversed and remanded for a new trial.